IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SARAH LEHR,  )
    Plaintiff,  )
                    )
  v.  )        Case No. 3: 23-cv-00675
                    )        Judge Trauger /Frensley
TAPESTRY, INC.,  )
    Defendant.  )

## REPORT AND RECOMMENDATION

This removed, pro se employment action is before the Court on defendant Tapestry, Inc.'s ("Tapestry") motion for summary judgment. Docket No. 22. Plaintiff opposes the motion and defendant has replied. After reviewing the record and the briefs, the undersigned recommends that defendant's motion be granted, and the action be dismissed in its entirety.

### I.    BACKGROUND

Plaintiff Sarah Lehr, a former store manager at the Coach Outlet store located in the Opry Mills Mall in Nashville, Tennessee, asserts Tapestry unlawfully terminated her from her position in retaliation for exercising her right to report retail theft from the store she managed. Docket. No. 1-2, p. 5. In her pro se complaint, Lehr asserted claims for gender discrimination under Title VII, a violation of the Tennessee Public Protection Act, and common law negligence.[1] Id., pp. 5-6. The district judge dismissed her Title VII claim as untimely, Docket Nos. 10-11, and Tapestry now moves for summary judgment on the remaining claims. Docket No. 22.

In support of its motion, Tapestry submitted excerpts of Lehr's deposition; a Statement of Undisputed Material Facts; a copy of Coach's April 2021 Loss Prevention Operations Manual;

---

[1] Plaintiff originally filed suit in the Circuit Court for Davidson County, Tennessee. Docket No. 1-2, pp. 4-6. Defendant removed to this court based on federal question and diversity jurisdiction. Docket No. 1.

and the sworn declaration of Melissa Perez, Director, North America People Partner, HR Director for Tapestry. Docket Nos. 23-25 and attached exhibits.

Lehr opposes the motion. Docket No. 27. In support, she submitted a copy of the Incident Report from the Metro Nashville Police Department ("MNPD" or "Metro Police") and documents from her unemployment claim from the Tennessee Department of Labor and Workforce Development. Docket No. 27.

The evidence reveals the following. Tapestry is a house of major accessories and lifestyle brands including Coach, Kate Spade, and Stuart Weitzman. Tapestry operates retail stores for each of its brands across the country. One such retail store is a Coach Outlet store at the Opry Mills Mall in Nashville, Tennessee. Docket No. 24, p. 1.

Lehr began working for Tapestry supporting its Coach New York brand in 2006. Id. at p 3. In 2015, she was transferred to the Coach Outlet location in Opry Mills Mall as that location's Store Manager. Id. As a Store Manager, Lehr was very familiar with Tapestry's loss prevention policies. Id., at p. 4.

Like most retailers, Tapestry has policies and procedures to address loss prevention. Id. Tapestry's policies and procedures for Coach, including those governing loss prevention, are compiled in Coach's Operations Manual ("Operations Manual"). Id. The loss prevention section of the Operations Manual states in pertinent part:

> The goal of the Loss Prevention (LP) department is the protection of Tapestry, Inc.'s assets, employees, and customers. The Loss Prevention department is responsible for conducting investigations that may involve theft or fraud from an internal or external standpoint and take appropriate action(s) in the best interest of the company.
>
> * * * *
>
> The policies and procedures below help create and maintain an honest and safe work environment for all employees. If these policies are overlooked, the security and integrity of our workplace is threatened.

2

> All employees must fully comply with the Loss Prevention Policies and Procedures. Any employee failing to comply is subject to disciplinary action up to and including termination.

Docket No. 24, p. 2.

The loss prevention portion of the Operations Manual contains a specific Shoplifting Policy. Id. The Shoplifting Policy states that Tapestry prioritizes safety over the protection or recovery of merchandise. Id. The Shoplifting Policy provides various non-confrontational strategies for avoiding shoplifting incidents in the first place; however, once an incident has occurred, addressing shoplifting, like all loss prevention, is to be managed by the Asset Protection department.[2] Id., at pp. 2-3. The Shoplifting Policy expressly instructs Tapestry employees regarding what they are prohibited from doing:

- Do not chase a person once they leave the store.

- Do not contact mall security for any reason involving shoplifting. Once the shoplifter leaves our store, they may discard the stolen items or pass [off] the product to another person. When they are stopped, there will be no items in their possession; thus, this action creates a liability situation.

- Do not approach the person outside the store.

- Do not make any hotline calls to mall security to report suspicious activity to other retailers without Loss Prevention approval.

- Only a Loss Prevention partner / the Law Department can authorize a store to prosecute an individual for theft.

- Police reports should be made for any theft over $1000 and/or 6 or more units or when directed to do so by a Multi-Manager or a Loss Prevention partner.

Docket No. 24, p. 3.

Store employers are directed to call police immediately if there is an ongoing threat to

---

[2] The Loss Prevention department was renamed the Asset Protection department and all references in the policies to Loss Prevention apply equally to Asset Protection.

safety. Id.

On May 30, 2022, when Lehr was working at the Coach Outlet, a female with two companions walked into the store. Id. The female was carrying an empty shopping bag, making Lehr suspicious that they may have "a situation." Id. After the female left, Lehr's suspicion led her to watch the store's surveillance camera footage, which indicated that the female had stolen a pair of slides by putting them in her empty shopping bag. Id. Lehr testified in her deposition that the suspected shoplifter never posed a physical threat to anyone. Id.

After reviewing the footage, Lehr either called or directed another employee to call mall security. Id. at p. 4. She did not call the MNPD or the Loss Prevention Department. Id. Mall Security connected her with Solaren, a private security company hired by the Opry Mills Mall. Id. Thereafter, mall security came to the store and Lehr showed them the surveillance footage. Id. at p. 5. Despite Tapestry's directive that only Loss Prevention or the Law Department was authorized to prosecute a shoplifter, Lehr told mall security that she intended to prosecute the shoplifting incident herself on behalf of the store. Id. at p. 5. Lehr testified that her actions were based on her own judgment about what needed to be done to curb theft at her store, regardless of Tapestry's policies. She testified, "[t]he police will tell you, the investigators from the Hermitage Police Department theft unit will tell you, 'If you want to stop the problem that you're having in your store, you have to prosecute.' They'll tell you that. And I agree with it, regardless of Tapestry's policy." Docket No. 23-1, p. 6.

Thereafter, Lehr and Sean Bock, assistant store manager, began walking around the mall with a mall security guard looking for the alleged shoplifter. Docket No. 24, p. 5. After walking through the mall for about a quarter of a mile, Lehr saw the suspect in Forever 21, another retail store in the mall. Id. Lehr walked into Forever 21 and confronted the shoplifter, demanding that

she come back and pay for the shoes she stole. Id. In response, the suspect ran through the mall toward a mall exit. Id. Lehr testified she chased after the suspect in "fast pursuit" with Bock and the mall security guard following behind her. Id. Lehr exited the mall and paused at a mall entrance where Bock and the mall security guard caught up with her. Id., p. 6. Mall security went into the parking lot to confront the suspect. Id. Lehr, along with Bock and the original mall security guard, walked into the parking lot where the suspect and mall security were standing. Id. Lehr again verbally engaged the suspect, telling her she was "tired of her coming into my store and stealing things she did not pay for." Id. Mall security eventually notified the MNPD about the incident. Id. Metro Police officers arrived, interviewed mall security, and ultimately allowed the suspect to leave without arresting her as the suspect no longer had the slides in her possession. Id. Lehr was angry at the time and confronted one of the police officers, stating, "Why in the F isn't this person being arrested?" Id. Lehr contacted her district manager or Loss Prevention department after returning to the store following the incident. Docket No. 24, p. 7.

> The MNPD Incident Report describes the incident as follows:
>
> Officers were working an extra job when security received a call from Coach stating there were shoplifters in Coach. The complainant followed the 3 suspects and eventually one of the suspects ran and was hiding behind some cars in the parking lot outside of H&M. The suspect did not have any merchandise on her at the time.
>
> The complainant told officers there is video footage of one of the suspects concealing a pair of teal Coach slides in a bag before leaving the store, That is when the complainant started following the group.
>
> The complainant doesn't know where the slids (sic) went, she never saw them get passed to another suspect.

Docket No. 27-1, p. 3.

Tapestry terminated Lehr from employment effective June 15, 2022. Docket No. 23, p. 7. Melissa Perez, HR Director, stated in her declaration that Lehr violated multiple provisions of

Tapestry's Shoplifting Policy, including calling mall security prior to notifying the Loss Prevention department, unilaterally deciding to prosecute a theft without the Loss Prevention department's involvement, and leaving the store to pursue a shoplifting suspect and confronting the suspect in another mall retail store. Docket No. 24, p. 7. She testified that Lehr's leaving the store to locate the shoplifting suspect and confronting the shoplifting suspect in another retail establishment were determinative of her termination. Id. Lehr submitted a concern about her termination through Tapestry's ethics hotline, and on June 24, 2022, Tapestry responded, stating the reason for her termination was her conduct in response to the May 30, 2022, shoplifting incident. Id. p. 8.

Perez further testified that after considering the circumstances, Tapestry elected not to terminate Bock. Docket No. 25, p. 4. Tapestry understood that as Bock's direct supervisor, Lehr had encouraged Bock to join her in leaving the store to search for the shoplifting suspect, putting Bock in a difficult and unfair position. Id. Given Lehr's experience and her role as store manager, Tapestry concluded that she was ultimately responsible for the pursuit in the mall. Id.

Perez further stated in her declaration that Tapestry strictly prohibits employees from physically confronting a suspected shoplifter inside a store or pursuing a suspected shoplifter out of a store. Docket No. 25, p. 2. The reasons for the prohibitions are threefold. First, Tapestry prioritizes the safety of its employees, its customers, and other people in the proximity of our retail stores. Avoiding a confrontation is paramount. Id. Once a shoplifter, or suspected shoplifter, leaves a store, Tapestry's commitment to safety requires avoiding the potential of a confrontation. Id. Second, a confrontation with a suspected shoplifter and its inherent danger involves exposing Tapestry to additional liability. Id. Third, Tapestry is committed to protecting the reputation of its brands. An accusation of theft that turned out to be false could be detrimental

to the reputation Tapestry has created with its customers. Id.

Perez testified that Coach has routinely terminated an employee's employment where the employee has left the store to pursue a suspected shoplifter. Id. Calling mall security before calling the Loss Prevention department, though prohibited by the Operations Manual, does not result in termination unless there are other policy violations. Id.

In September 2022, Lehr submitted a claim for unemployment benefits. Id. Due to a "systematic glitch" on the part of the state that occurred in September 2022, the Division of Unemployment Security ("Unemployment Office") did not initially process Lehr's claim. Id. Thereafter, on December 29, 2022, the Unemployment Office initially denied Lehr benefits, but on January 11, 2023, awarded her benefits when Tapestry elected not to challenge her appeal. Id.

## II. DISCUSSION

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(a)*. If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan,* 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

At this stage, " 'the judge's function is not ... to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'

" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 252 (1986). An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan,* 578 F.3d at 374 (citing *Anderson,* 477 U.S. at 252).

### A. Tennessee Public Protection Act ("TPPA")

Tapestry argues Lehr has failed to establish a prima facie case for retaliatory discharge under the TPPA because she did not engage in protected activity, and even if she had, she was not terminated solely for engaging in any arguably protected activity, but for decision to pursue a shoplifter outside of the store. Docket No. 23, p. 11. The undersigned agrees.

The Tennessee Public Protection Act, Tennessee's whistleblower legislation,[3] was enacted to protect employees from being discharged in retaliation for "blowing the whistle" on infractions of rules, regulations, or the law pertaining to the health, safety, and general welfare of the public. *Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 18 I.E.R. Cas. (BNA) 1459 (Tenn. 2002). The TPPA gives statutory protection to employees whose actions served to deter, expose, and stop organizational wrongdoing. *Williams v. City of Burns*, 465 S.W.3d 96, 110 (2015). The TPPA provides that no employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities. T. C. A. § 50-1-304(b).

---

[3] All fifty states have enacted legislation designed to encourage the reporting of wrongdoing by deterring retaliation against "whistleblowers," generally defined as "organization members ... who disclose illegal, immoral, or illegitimate practices (including omissions) under the control of their employers, to persons or organizations who may be able to effect action." 10 Norman D. Bishara et al., *The Mouth of Truth*, 10 N.Y.U. J.L. & BUS. 37, 43, 52 (Fall 2013) (quoting Janet P. Near & Marcia P. Miceli, *Organizational Dissidence: The Case of Whistle–Blowing*, 4 J. Bus. Ethics 1, 2, 4 (1985)).

Two types of claims are cognizable under the TPPA: (1) discharge in retaliation for refusing to remain silent about illegal activities, i.e., "whistleblowing," and (2) discharge in retaliation for refusing to participate in illegal activities. *Foster v. Mastec N. Am.*, 3:21-cv-00737, 2023 WL 3513685, *1 (May 17, 2023)(quotation omitted). For both types of retaliatory discharge, the plaintiff must show that he was employed by the defendant and that he was discharged. In a whistleblowing claim, the plaintiff must show that he refused to remain silent about his employer's illegal activities, and the requisite causal relationship between his refusal to remain silent and his discharge. *See, VanCleave v. Reelfoot Bank*, 2009 WL 3518211, at *8 (citation and footnotes omitted). In a refusal-to-participate claim, the plaintiff must show that he refused to participate in illegal activities and the requisite causal relationship between his refusal to participate and his discharge. *Id.*

To establish a prima facie case under the TPPA, Lehr must establish: (1) she was employed by Tapestry; (2) she either refused to participate in or refused to remain silent about illegal activity; (3) Tapestry terminated her employment; and (4) Tapestry terminated her employment solely because she engaged in the protected activity. *See Williams*, 465 S.W.3d at 111.

To demonstrate protected activity for purposes of a whistleblowing claim, a plaintiff must show that she "reported the employer's illegal activity and that the 'reporting of the illegal activity furthered a clear public policy.'" *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 37 (Tenn. 2015) (quotation omitted). A claim asserting a refusal to participate does not require the employee to show that he reported the illegal activity. *Id.* at 37, n.3. *Foster*, 2023 WL 3513685 at *2. "Under the TPPA, 'illegal activities' include 'activities that are in violation of the criminal or civil code of [Tennessee] or the United States or any regulation intended to protect the public

health, safety or welfare.'" *Ford v. Page*, 638 F. Supp. 3d 812, 820 (M.D. Tenn. 2022) (quoting Tenn. Code. Ann. § 50-1-304).

To establish the fourth element, Lehr must establish exclusive causation between her asserted protected activity and her termination. *See* Tenn. Code. Ann. § 50-1-304(b). "The General Assembly's choice of the term 'solely' means an employee can prevail with a [TPPA] claim only if … she can prove that … her refusal to participate in or to remain silent about illegal activities was the only reason for the termination." *Williams*, 465 S.W.3d at 110-11.

Only the second and fourth elements are at issue. Here, Lehr has failed to establish the second element, that she engaged in protected activity. Lehr does not allege that she refused to participate in criminal activity, rather she testified that she exercised her right to report "the crime of retail theft." Docket 23-1, p. 1. Lehr is therefore presumably asserting the second type of protected activity under the TPPA, refusing to remain silent about illegal activity.

Lehr's asserted activity is not "protected activity," however, within the meaning of the TPPA. Lehr did not report wrongful conduct activity by her employer, or by another employee or coworker--the hallmark of "whistleblowing"-- but responded to alleged illegal activity (theft) by a *third party outside of her organization committed against her employer*. The TPPA does not apply to Lehr because her reporting did allege wrongful conduct of her employer or of another employee within her organization. *But see*, *Downing v. Astrazeneca Pharmaceuticals, LP*, 2023 WL 4672411 at *3 (M.D. Tenn. July 20, 2023) (holding an employee's reporting of alleged illegal activity (sexual harassment and sexual activity involving a minor) by another employee outside the scope of employment was sufficient to state a claim under the TPPA).

Lehr testified that she disagreed with Tapestry's policies and judgment in pursuing theft prosecutions. She testified, "[t]he police will tell you, the investigators from the Hermitage

10
Case 3:23-cv-00675    Document 42    Filed 05/02/25    Page 10 of 14 PageID #: 351

Police Department theft unit will tell you, 'If you want to stop the problem that you're having in your store, you have to prosecute.' They'll tell you that. And I agree with it, regardless of Tapestry's policy." Docket No. 23-1, p. 6. The evidence demonstrates Lehr substituted her own judgment regarding the criminal prosecution of retail theft for that of her employer's, which is not protected activity under the TPPA. She therefore fails to meet the second element for a prima facie case.

Lehr also fails to establish the fourth element of a prima facie case, that she was terminated solely for engaging in protected activity. It is undisputed that Lehr's termination was the result of several violations of Tapestry's Shoplifting Policy, most importantly, her leaving the store, confronting a suspected shoplifter, and chasing the suspect through the mall. Docket No 25, p. 3.

Based on the above, the undersigned concludes Lehr has failed to establish a prima face case for retaliatory discharge under the TPPA and the court's analysis therefore ends.[4] Lehr's TPPA claim fails as a matter of law.

B. State Law Negligence Claim

Lehr next asserts Tapestry was negligent in failing to provide the unemployment office the reason for her termination, resulting in a months-long delay in the receipt of her unemployment benefits. Docket No. 1-2, p. 6. Tapestry argues this claim fails because Lehr

---

[4] Even assuming Lehr could establish a prima facie case for retaliatory discharge, Tapestry has established a non-retaliatory reason for her termination and Lehr cannot show pretext. See *Williams*, 465 S. W. 3d at 112 (TPPA codifies the *McDonnell Douglas* burden-shifting analysis, and the burden of production shifts to Tapestry to identify a non-retaliatory reason for Lehr's termination.). Once Tapestry proffers a non-retaliatory reason for the discharge, the burden shifts to Lehr to establish an issue of fact indicating the proffered reason was pretextual. Id. at 118. Tapestry proffered a reason for Lehr's termination that is independent of any alleged refusal to remain silent, i.e., her violations of Tapestry's operations and shoplifting policies. Lehr must then demonstrate a factual dispute that the stated reason for her termination was pretextual. On this record, the Court concludes that she cannot.

cannot establish the requisite causation for a negligence cause of action. Docket No. 23, Pahe ID #147. The undersigned agrees.

As a preliminary matter, a claimant's rights and remedies related to a claim for unemployment benefits are governed by the Tennessee Employment Security Law ("Unemployment Statute"), T. C. A. § 50-7-101, *et seq*. The remedy for an employer's delay in providing information in the unemployment process is provided in the Unemployment Statute:

> If a separation issue exists, the separating employer will be asked to supply information describing circumstances leading to the separation. The information must be received by the agency within seven (7) days from the date the agency request for information is mailed to the separating employer. *In the absence of the response, the decision of entitlement will be based on the claimant's statement and other information available to the agency.*

T. C. A. § 50-7-304(b)(2)(C) (emphasis added). The burden of proving a disqualification to receive benefits is on the employer. *Simmons v. Culpepper*, 937 S.W.2d 938, 945 (Tenn. Ct. App. 1996).

To the extent Lehr is attempting to create a remedy the state legislature did not intend under the Unemployment Statute, the attempt fails. Neither the parties, nor the Court has found case authority in which a Tennessee Court has recognized a negligence claim in the context of the administration of an unemployment claim.

Turning to the merits, under Tennessee law, a plaintiff must establish the following elements negligence cause of action: (1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *McCall v. Wilder,* 913 S.W.2d 150, 153 (Tenn. 1995).

Lehr cannot establish causation because Tapestry did not actually or proximately cause a delay in Lehr's receipt of benefits. Chapter 7 of Title 50 of the Tennessee Code establishes the

unemployment compensation fund. Claims for benefits are filed and processed in accordance with the statute and regulations established by the Commissioner of Labor and Workforce Development. T. C. A. § 50–7–304(a). The claim is presented to an agency representative who examines the claim to make a "monetary determination" of its validity. T. C. A. § 50–7–304(b)(1)(A).

Lehr testified at her deposition that she submitted her claim for unemployment benefits in September 2022, several months after her June 15, 2022, termination. Docket No. 23-1, p. 10. She testified that the unemployment office later informed her it initially failed to process her claim due to a "systematic glitch" that occurred in September 2022 on the part of the state. Id. at 158-59. This chronology demonstrates that any delay in Lehr's receipt of benefits were caused by her own delay in applying for benefits, and thereafter, the unemployment office's September 2022 systematic glitch and subsequent delay in processing her claim. Accordingly, Lehr's negligence claim fails as a matter of law.

### III. CONCLUSION

Based on the foregoing, the undersigned recommends that Defendant Tapestry, Inc.'s motion for summary judgment (Docket No. 22) be **GRANTED** and the claims against it be **DISMISSED WITH PREJUDICE.**

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See*

*Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

_____
**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**